IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**HEATHER SHUSTER,**

       **Plaintiff,**

  v.                                          **Civil Action 2:16-cv-136**
                                                  **Judge George C. Smith**
                                                  **Magistrate Judge Jolson**

**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

**REPORT AND RECOMMENDATION**

Plaintiff, Heather Shuster, acting on behalf of C.L.E., a minor, filed this action seeking review of a decision of the Commissioner of Social Security denying C.L.E.'s application for supplemental security income. For the reasons that follow, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the Administrative Law Judge under Sentence Four of § 405(g).

**I.**    **BACKGROUND**

Plaintiff filed C.L.E.'s application for supplemental security income on August 22, 2012, alleging that C.L.E. became disabled on December 31, 2007. (Doc. 10-2, PAGEID #: 62). After initial administrative denials of her claim, an Administrative Law Judge ("ALJ") held a hearing on May 22, 2014. (*Id.*, PAGEID #: 80). Both Plaintiff and C.L.E. testified. (*Id.*, PAGEID #: 80–112). The ALJ issued a decision denying benefits on June 25, 2014. (*Id.*, PAGEID #: 62–75). Plaintiff filed the instant case on February 2, 2016, seeking review of the decision denying

C.L.E.'s application for supplemental security income, and it is now ripe for review. (*See* Doc. 4 (complaint); Doc. 10 (administrative record); Doc. 11 (statement of specific errors); Doc. 15 (Commissioner's response); Doc. 16 (Plaintiff's reply)).

### A. Educational Records

Sharon Gaddis, C.L.E's first grade teacher, completed a teacher questionnaire on October 4, 2012. (Doc. 10-6, PAGEID #: 210). The portion of the form pertaining to interacting and relating with others directed Ms. Gaddis to answer questions using the following scale: 1 for no problem; 2 for a slight problem; 3 for an obvious problem; 4 for a serious problem; and 5 for a very serious problem. (*Id.*, PAGEID #: 213). It also asked Ms. Gaddis to rate the frequency of the problem, whether it occurred monthly, weekly, daily, or hourly. (*Id.*). Ms. Gaddis answered that C.L.E. has a slight problem seeking attention appropriately (no frequency indicated), taking turns in a conversation (no frequency indicated), and using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation (daily). (*Id.*). Ms. Gaddis indicated that C.L.E. has an obvious problem relating experiences and telling stories (daily), using language appropriate to the situation and listener (daily), and introducing and maintaining relevant and appropriate topics of conversation (no frequency indicated). (*Id.*). She further answered that C.L.E. has a serious problem playing cooperatively with other children (daily), making and keeping friends (daily), and expressing anger appropriately (daily). (*Id.*). Finally, Ms. Gaddis stated that C.L.E. has a very serious problem asking permission appropriately (daily), following rules (classroom, games, sports) (daily), respecting/obeying adults in authority (hourly), and interpreting meaning of facial expression, body language, hints, and sarcasm (hourly). (*Id.*).

Ms. Gaddis indicated that she has used a behavior/discipline plan, time-out, and removal from the classroom in an effort to modify C.L.E.'s behavior. (*Id.*). She also stated that C.L.E. "appears to understand/comprehend what is expected of her, but she does not ask for permission to do things, bosses other students, and does not show respect or obey the rules." (*Id.*).

Mrs. Rupe, C.L.E's second grade teacher, completed a teacher questionnaire and a Conners Teacher Rating Scale-Revised form on March 5, 2014. (Doc. 10-6, PAGEID #: 250–54). Mrs. Rupe answered, *inter alia*, that C.L.E. occasionally does not listen when spoken to directly; loses things necessary for tasks and activities (school assignments, pencils, or books); fidgets with her hands or her feet or squirms in her seat; has difficulty waiting in line; loses her temper; actively defies or refuses to comply with adults' requests or rules; is angry or resentful; is spiteful and vindictive; initiates physical fights; lies to obtain goods for favors or to avoid obligations (*i.e.*, "cons" others); is fearful of trying new things for fear of making mistakes; blames herself for problems, feels guilty; and is sad, unhappy, or depressed. (*Id.*). She indicated that C.L.E. often has difficulty sustaining attention in tasks or activities; avoids, dislikes, or is reluctant to engage in tasks that require sustained mental effort; has difficulty playing or engaging in leisure activities quietly; bullies, threatens, or intimidates others; and is self-conscious or easily embarrassed. (*Id.*). Finally, Mrs. Rupe answered that C.L.E. very often fails to give attention to details or making careless mistakes in schoolwork; does not follow through on instructions and fails to finish schoolwork (not due to oppositional behavior or failure to understand); has difficulty organizing tasks or activities; is easily distracted by extraneous stimuli; leaves her seat in classroom or in other situations in which remaining seated is expected; is "on the go" or often acts as if "driven by a motor;" talks excessively; blurts out answers before

3

questions have been completed; interrupts or intrudes on others (*e.g.*, butts into conversations or games), and is fearful anxious or worried. (*Id.*).

The academic performance and classroom behavior portion of the questionnaire used a five-point scale ranging from 1 for problematic, 2 for in between problematic and average, 3 for average, 4 for in between average and above average, 5 for above average. (*Id.* at 251). Mrs. Rupe indicated that C.L.E. is average in reading, math, and written expression, and is slightly above average, a 4, in homework completion. (*Id.*). She answered that C.L.E.'s classroom behavior is problematic in her relationship with peers, following directions/rules, and disrupting class. (*Id.*). Mrs. Rupe's written observations note, *inter alia*, that C.L.E. "is often impulsive in behavior. She says things that sometimes do not have anything to do with our work. She often complains about any/all ailments and gets involved in other people's business." (*Id.*).

As Plaintiff notes, "the second item from Mrs. Rupe, the Conners scale, was very similar to the first part of the form, utilizing a similar scale to rate the frequency of certain behaviors." (Doc. 11 at 4). The Court agrees, so only notes Mrs. Rupe's observations that it was "pretty much true (often, quite a bit)" that C.L.E. argues with adults and it was "very much true (very often, very frequent)" that C.L.E. disturbs other children, interrupts or intrudes on others (*e.g.*, butts into others' conversations or games), and is excitable and impulsive. (Doc. 10-6, PAGEID #: 252).

**B.     Relevant Medical Records**

Two psychological evaluations and a medical interrogatory are pertinent to Plaintiff's statement of errors.

1. **Radha B. Nadkarni, Ph.D.**

Psychologist Radha B. Nadkarni, Ph.D. examined C.L.E. in May and June 2012, upon referral from C.L.E.'s counselor for an Attention Deficit/Hyperactivity Disorder (ADHD) evaluation. (Doc. 10-7, PAGEID #: 388). She noted C.L.E.'s affect did not present any "major threat to the validity of testing." (*Id*.). Dr. Nadkarni reported that a brief screen of C.L.E.'s general cognitive ability resulted in an overall score in the average range, and her performance on a computerized measure of sustained attention and inhibitory control (TOVA) was indicative of difficulties associated with attention. (*Id*., PAGEID #: 388–89).

> Dr. Nadkarni observed that:
>
> Norm-referenced rating scales (Child Behavior Checklist/Teacher's Report Form and Conners' Parent and Teacher Rating Scale Revised (L)) were completed by mother and teacher. Both respondents rated ADHD, Combined Type, oppositional defiant problems, affective problems, aggressive behavior, restless-impulsivity, and emotional liability in the clinically significant range (T score > 70). Teacher rated social problems, withdrawn behavior, and pervasive developmental problems in the clinically significant range.

(*Id*., PAGEID #: 389). She indicated that somatic complaints were in the borderline range. (*Id*.). With respect to C.L.E.'s diagnoses, Dr. Nadkarni found that:

> [h]istorically, [C.L.E.] has been diagnosed with Anxiety Disorder, NOS. Parent and [C.L.E.] endorsed 2 symptoms of Separation Anxiety Disorder, Parent endorsed 1 symptom of PTSD. [C.L.E.] denied experiencing/witnessing any traumatic event. [C.L.E.] continues to meet the criteria for anxiety disorders, NOS. In addition, she meets the criteria for ADHD, Inattentive Type (314.00) and Oppositional Defiant Disorder (313.81).

(*Id*.). She also indicated that "[a] diagnosis of psychotic disorder continues to need to be ruled out." (*Id*.).

Dr. Nadkarni found the ratings indicative of affective problems, restless-impulsivity, and emotional liability are likely symptoms related to C.L.E.'s diagnoses of ADHD, ODD, and

anxiety.  (*Id.*).  However, Dr. Nadkarni advised that if these symptoms persist or worsen after C.L.E.'s ADHD, ODD, and anxiety is treated, "a mood disorder may need to be ruled out."  (*Id.*).

In determining whether there was evidence to support a diagnosis of autism spectrum disorder, Dr. Nadkarni noted that C.L.E. had appropriate eye contact and joint attention, was able to interact with her, and seemed to enjoy the interaction.  (*Id.*).  Dr. Nadkarni thus found no evidence of autism spectrum disorder but noted that "[i]t is possible that her reported difficulty with social interaction may be due to aggressive and defiant behavior."  (*Id.*).  Dr. Nadkarni's recommendations included the following:

1. Psychoeducation for parents to increase knowledge of ADHD, anxiety and ODD – the Nationwide Children's Hospital ADHD Academy . . . , Russell Barkley's book *Taking Charge of ADHD*, Roland Rapee's book *Helping Your Anxious Child*, Alan Kazdin's book *The Kazdin Method of Parenting the Defiant Children* and websites (such as CHADD.org).

2. Consultation with the pediatrician regarding medication options.

3. Share the results of this evaluation with school personnel to see if any accommodations can be made for [C.L.E.], based on her diagnosis of ADHD. Accommodations might include 1-on-1 or small group instruction to help with attention, allowing frequent breaks, reduced workload, frequent prompts/reminders to stay on task, daily communication between home and school regarding attention and work performance, and use of a reward system to reinforce on-task behavior.

4. Ongoing outpatient therapy with Ms. Lerner to reduce anxiety symptoms and increase compliance.  Use of evidence-based interventions—e.g., *Barkley's Defiant Children or Incredible Years Program*—is likely to be helpful in teaching parents more advanced behavior management skills.

5. Finally, Nationwide Children's Hospital offers social skills training (STAR program) through Speech and Language Pathology Clinic (call (614) 722-2200 for details).  Given her ADHD diagnosis and difficulty with social interaction, [C.L.E.] may be eligible to receive social skills training through this program.

(*Id.*).

### 2. Courtney Kerns-Huffman, Ph.D., L.P.C.

Dr. Courtney Kerns-Huffman, Ph.D., L.P.C. provided a psychological evaluation of C.L.E. (Doc. 10-8, PAGEID #: 761–70). C.L.E.'s pediatrician referred C.L.E. to Dr. Kerns-Huffman "for a mental health treatment as a result of a range of behavioral issues related to her diagnosis of Attention Deficit Hyperactivity Disorder" and because he believed C.L.E. and her mother "were in need of coping strategies and skills to successfully manage [C.L.E.'s] problematic patterns of behavior and home and at school." (*Id.*, PAGEID #: 761). Dr. Kerns-Huffman acquired information concerning C.L.E.'s background from "a range of detailed medical records and a clinical interview with C.L.E.'s biological mother," both "regarded to be accurate sources of information." (*Id.*).

Dr. Kerns-Huffman stated that:

> [C.L.E.] has historically experienced difficulty successfully navigating school rules and academic expectations. Her mother has frequently received reports indicating that [C.L.E.'s] teacher has observed her engaging in counterproductive behavior including initiating negative interaction with peers and disregarding academic expectations. [C.L.E.] displays socially inept behaviors that present challenges to maintaining meaningful relationships with other students. She has a history of problematic behavior in social settings and lack of understanding about ways to positively interact with peers. Documentation indicates that her past behaviors in academic placement were significant enough that [C.L.E.] often received disciplinary action resulting in consequences in the school setting.

(*Id.*, PAGEID #: 761–62). Dr. Kerns-Huffman noted, however, that academic reports had shown recent improvement. (*Id.*, PAGEID #: 762).

Dr. Kerns-Huffman noted C.L.E.'s behavior during the psychological evaluation was cooperative and focused, and her pleasant affect and persistence indicated that "test results are likely to be an accurate assessment of her current functioning." (*Id.*, PAGEID #: 763). She also noted that C.L.E.'s behavior during testing was a "sharp departure from the behavior that she has reportedly historically demonstrated during academic oriented tasks in the school environment."

7

(*Id.*; *see also id.*, PAGEID #: 765 (noting that C.L.E.'s cooperative and focused behavior "could be attributed to 1-to-1 testing" and did not "compromise the integrity of the test results"). In contrast, Dr. Kerns-Huffman observed that C.L.E. "is typically disruptive in her patterns of behavior" at school and home and "demonstrates significant difficulty in successfully completing tasks and responsibilities." (*Id.*, PAGEID #: 763). She explained that C.L.E.'s "behavior creates significant obstacles in her learning process and ability to acclimate in an academic environment." (*Id.*).

Dr. Kerns-Huffman found that C.L.E.'s difficulty in peer relationships can be attributed to her "inept social disruptive behaviors, and inappropriate patterns of interaction with peers." (*Id.*). She also determined that, because of C.L.E.'s "actions, decision-making, and avoidance behavior, it has become increasingly difficult to redirect [C.L.E.'s] maladaptive patterns of behavior in the home and school environment." (*Id.*). Dr. Kerns-Huffman stated that C.L.E. is considered to be near the average range of cognitive functioning for her age and grade level. (*Id.*). However, Dr. Kerns-Huffman opined that C.L.E.'s "problematic patterns of maladaptive behavior" may have "created perceived intellectual deficits." (*Id.*, PAGEID #: 765).

Specifically as to C.L.E.'s social emotional functioning, Dr. Kerns-Hoffman's findings included that C.L.E. "has difficulty forming meaningful relationships due to her inability to self-regulate and her lack of awareness for the impact that her behavior has on her peers;" "desires the company of her peers in home and school environments, but unfortunately this interaction often manifests in ways that are inappropriate and socially unacceptable;" "struggles to verbally express thoughts and feelings in appropriate ways and lacks impulse control;" and "lacks the ability to self-regulate and has limited awareness of the thoughts and feelings of those around her." (*Id.*, PAGEID #: 766). Dr. Kerns-Huffman noted that C.L.E. can be withdrawn and

defiant, can fail to make eye contact, and can have moods that fluctuate "tremendously" even when unprompted.  (*Id*.).  Dr. Kerns-Huffman stated that C.L.E. "engages in socially inappropriate behavior and expresses a lack of reasoning skills related to the same."  (*Id*.).  She also noted that C.L.E. "lacks the ability to delay gratification and is willing to engage in acting out behavior to have her needs met immediately."  (*Id*.).  Dr. Kerns-Huffman concluded that C.L.E. had a lack of reasoning skills related to inappropriate behavior, arising from her lack of acknowledgement for social boundaries and inability to comprehend socially acceptable behavior. (*Id*.).

Based on an assessment completed on December 19, 2013, Dr. Kerns-Huffman described C.L.E.'s interpersonal difficulties as follows:

> An inability to build or maintain satisfactory interpersonal relationships with peers and teachers.  An analysis of the current Behavior Evaluation Scale indicates that the following behaviors continue to be noted at least on a weekly basis:  Fights with brothers, sisters, or friends (continuously), Responds inappropriately to friendly teasing, joking, name calling, or sarcastic remarks (continuously), Does not share possessions or materials (continuously), Does not allow others to take their turn, participate in activities games (weekly), Gets upset when bumped, touched, brushed against (continuously), Has little interaction with peers (continuously), Is not accepted by other children or adolescents in the neighborhood (continuously), and Responds inappropriately to others' attempts to be friendly, complimentary, sympathetic (continuously).

(*Id*., PAGEID #: 767–68).  She stated that C.L.E. can be "expected to experience difficulty with assimilating to a school environment, engaging in self-regulation, engaging in positive patterns of communication, and functioning academically and socially with continued avoidance of coping strategies."  (*Id*., PAGEID #: 769).

In conclusion, Dr. Kerns-Huffman stated, "It is my professional opinion that C.L.E.'s compromised self-regulation skills negatively impact her ability to function well in academic, home, and social settings.  This coupled with her lack of understanding for behavioral

expectations and interpersonal skills create obstacles to her ability . . . to function effectively in her daily life on a consistent basis." (*Id*., PAGEID #: 769–70). Dr. Kerns-Huffman noted a current diagnosis of ADHD and indicated that C.L.E. is "currently being observed in treatment to rule out Intermittent Explosive Disorder." (*Id*., PAGEID #: 770). Her recommendations included:

1. Continued mental health treatment to help [C.L.E.] learn coping skills for self-regulation and anger management.
2. Continued improvement with taking ownership of actions.
3. Continue working through mental health treatment plan.
4. Continued behavior modification training.

(*Id*.).

### 3. C.R. Block, M.D.

Dr. C.R. Block, M.D. completed a medical interrogatory on February 14, 2014, sent to him by the ALJ. (Doc. 10-7, PAGEID #: 649–55). Although he never examined C.L.E. personally, he indicated that he reviewed the evidence supplied to him with the interrogatory. (*Id*., PAGEID #: 649). Dr. Block opined that none of C.L.E.'s impairments, either individually or in combination, met or equaled the requirements of any of the listing as described in the Listing of Impairments. (*Id*., PAGEID #: 652). Dr. Block opined specifically on, *inter alia*, the domain pertaining to interacting and relating with others. (*Id*., PAGEID #: 653). With respect to that domain, Dr. Block indicated that C.L.E. has a less than marked impairment. (*Id*.). When asked to describe the child's functioning and discuss the evaluation of this domain, Dr. Block answered "see 2E," the teacher questionnaire completed by Ms. Gaddis. (*Id*.).

### C. Relevant Portions Of The ALJ's Decision

The ALJ first found that C.L.E. was a school-age child when the application was filed and as of the date of the decision. (Doc. 10-2, PAGEID #: 65). Next, the ALJ found that C.L.E. had not engaged in substantial gainful activity since her alleged onset date. (*Id*.). Going to the

next step of the sequential evaluation process, the ALJ concluded that the child had severe impairments including chronic constipation and encopresis, obesity, an anxiety disorder, an attention deficit/hyperactivity disorder, an oppositional defiant disorder, allergic rhinitis, and Tourette syndrome. (*Id*.).

The ALJ also found that C.L.E.'s impairments did not, at any time, meet or equal the requirements of any section of the Listing of Impairments, or functionally equal those requirements. (*Id*., PAGEID #: 65–74). In reviewing the six domains of functioning that are pertinent to a child's benefits application, the ALJ determined:

1. C.L.E. has a "less than marked" limitation in acquiring and using information;

2. C.L.E. has a "marked" limitation in attending and completing tasks;

3. C.L.E. has a "less than marked" limitation in interacting and relating with others;

4. C.L.E. has a "less than marked" limitation in moving about and manipulating objects;

5. C.L.E. has a "less than marked" limitation in the ability to care for herself; and

6. C.L.E. has a "less than marked" limitation in health and physical well-being.

(*Id*.).

Particularly relevant are the ALJ's findings concerning interacting and relating with others. As to that domain, the ALJ found the following:

> The claimant has less than marked limitation in interacting and relating with others. The claimant's mother testified that the claimant has difficulty getting along with other children and is often aggressive and demanding with other children and adults at home. The objective evidence indicates that the claimant was sometimes demanding or uncooperative during treatment, including therapy, yet the psychologists who evaluated the claimant noted that her eye contact was good, that she communicated effectively, was compliant, and that rapport was easily established (Exhibits 4F/1, 2; 16F/2, 6). Her teacher indicated a range of difficulty in this area, and stated that the claimant appears to understand what is expected of her in social interactions, but that she does not ask for permission to do things, bosses other students, and does not show respect or obey rules. (Exhibit 2E/4). However, she does not receive special programming at school,

11

> and she was terminated from behavioral therapy through the Children's Hospital after successfully completing behavior modification sessions (Exhibit 10F/15). Further, although she was diagnosed with Tourette syndrome tics, they were not observed or heard during behavioral therapy, and she presented as appropriate for her developmental age during the hearing (Exhibit 10F). Dr. Block opined that the evidence supported a finding that the claimant's difficulty in this area is less than marked, which is consistent with the totality of the evidence.

(*Id*., PAGEID #: 72). Because a finding of one "extreme" limitation or two "marked" limitations is needed in order to support an award of benefits, the ALJ denied Plaintiff's claim. (*Id*., PAGEID #: 75).

## II.     STANDARD OF REVIEW

The Sixth Circuit has summarized the regulations concerning a child's application for disability benefits, stating:

> The legal framework for a childhood disability claim is a three-step inquiry prescribed in 20 C.F.R. § 416.924. The questions are (1) is the claimant working, (2) does the claimant have a severe, medically determinable impairment, and (3) does the impairment meet or equal the listings? * * * An impairment can equal the listings medically or functionally * * *. The criteria for functional equivalence to a listing are set out in § 416.926a. That regulation divides function up into six "domains":
>
> (1) Acquiring and using information;
> (2) Attending and completing tasks;
> (3) Interacting and relating with others;
> (4) Moving about and manipulating objects;
> (5) Caring for yourself; and
> (6) Health and physical well-being.
>
> § 416.926a(b)(1). To establish a functional impairment equal to the listings, the claimant has to show an extreme limitation in one domain or a marked impairment in more than one. § 416.926a(d). Lengthy definitions for marked and extreme are set out in § 416.926a(e). Each includes instructions on how to use test results:
>
> "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

12

> § 416.926a (e)(2)(i).
>
> "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.
>
> § 416. 926a (e)(3)(i).

*Kelly v. Comm'r of Soc. Sec.*, 314 F. App'x 827, 832 (6th Cir. 2009).

In the context of that legal framework, the Court's review "is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards." *Winn v. Comm'r of Soc. Sec.*, 615 F. App'x 315, 320 (6th Cir. 2015); *see* 42 U.S.C. § 405(g). "[S]ubstantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). The Commissioner's findings of fact must also be based upon the record as a whole. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985). To this end, the Court must "take into account whatever in the record fairly detracts from [the] weight" of the Commissioner's decision. *Rhodes v. Comm'r of Soc. Sec.*, No. 2:13-cv-1147, 2015 WL 4881574, at *2 (S.D. Ohio Aug. 17, 2015).

## III. DISCUSSION

In her statement of specific errors, Plaintiff argues: (1) the ALJ's determination that C.L.E. did not functionally equal the listings was not supported by substantial evidence; and (2) the ALJ's rejection of pertinent opinion evidence was based upon application of an erroneous legal standard and upon a plain mistake of fact.

### A.      Whether The ALJ's Decision Was Supported By Substantial Evidence

In her first statement of error, Plaintiff argues that the ALJ improperly assigned great weight to the written interrogatories of medical expert Dr. Block. (Doc. 11 at 10). Plaintiff notes that, although each domain asked for a description of the child's functioning and a discussion of the evaluation, Dr. Block only cited the record. (*Id.*). Plaintiff specifically points to Dr. Block's answer for domain three, interacting and relating with others (*id.*), which considers how well a child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. 20 C.F.R. § 416.926a(i). With respect to that domain, Dr. Block opined that C.L.E. has less than a marked impairment, stating "see 2E" as support. (Doc. 10-7, PAGEID #: 653).

Exhibit 2E is the teacher questionnaire completed by Ms. Gaddis, C.L.E.'s first grade teacher. Plaintiff states:

> Ms. Gaddis opined that on an hourly basis, C.L.E. had very serious problems "Respecting/obeying adults in authority" and "interpreting meaning of facial expression, body language, hints, sarcasm," and on a daily basis, had very serious problems "[a]sking permission appropriately" and "[f]ollowing rules (classroom, games, sports)." Ms. Gaddis further explained that "[b]ehavior/[d]iscipline plan, time-out, removal from classroom have all been utilized," but despite appearing to understand expectations, C.L.E. would not ask permission to do things, "bosses other students, and does not show respect or obey the rules."

(*Id.* (internal citations omitted)). Thus, Plaintiff argues, *inter alia*, that Ms. Gaddis's opinion contradicted Dr. Block's determination that C.L.E. had a less than marked impairment for domain three. (*Id.*).

In opposition, Defendant admits that Dr. Block "could have provided more explicit or detailed explanations." (Doc. 15 at 8). However, Defendant claims that Dr. Block's opinion was one of multiple sources relied on by the ALJ to assess C.L.E.'s functional limitations. (*Id.* at 3).

The Court agrees that the ALJ relied on multiple sources to assess C.L.E.'s ability to interact and relate with others.  However, a reasonable mind would not accept the evidence the ALJ relied on as adequate to support his conclusion that C.L.E. had a less than marked impairment in that domain.

In finding that C.L.E. had a less than marked limitation in interacting and relating with others, the ALJ relied on the psychologists' observation of her demeanor; Ms. Gaddis's comment that C.L.E. appears to understand what is expected of her in social interactions; the fact that C.L.E. does not receive special programming at school and terminated her behavioral therapy; and that C.L.E.'s Tourette syndrome tics were not observed or heard during behavioral therapy, and she presented as appropriate for her developmental age during the hearing.  (Doc. 10-2, PAGEID #: 72).  Perhaps most significantly, the ALJ relied on Dr. Block's opinion that the evidence supported a finding that C.L.E.'s difficulty in this area is less than marked, which is consistent with the totality of the evidence.  (*Id*.).  The Court examines this evidence in turn.

The ALJ first found that, although "the objective evidence indicates that the claimant was sometimes demanding or uncooperative during treatment, including therapy, . . . the psychologists who evaluated the claimant noted that her eye contact was good, that she communicated effectively, was compliant, and that rapport was easily established (Exhibits 4F/1, 2; 16F/2, 6)."  (Doc. 10-2, PAGEID #: 72).  However, the psychologists offered those observations concerning C.L.E.'s demeanor to demonstrate that testing was likely to yield valid results.  (*See, e.g.*, Doc. 10-7, PAGEID #: 388 (describing C.L.E.'s demeanor and noting "[o]verall, there were no major threats to the validity of testing"); Doc. 10-8, PAGEID #: 763 ("Based on [C.L.E.'s] behavior, her apparent effort and cooperation, and testing administration, test results are likely to be an accurate assessment of her current functioning."); *id*., PAGEID #:

15

765 (noting that C.L.E.'s "contrast in behavior" during testing could be attributed to the 1-to-1 testing environment, but are not perceived to compromise the integrity of test results")). Additionally, Dr. Nadkarni also noted C.L.E.'s eye contact and joint attention in finding that there was no evidence to support a diagnosis of autism spectrum disorder. (Doc. 10-7, PAGEID #: 389). Thus, the observations concerning C.L.E.'s demeanor were offered for reasons other than to determine whether C.L.E. suffered from an impairment in interacting and relating with others.

The ALJ also relied on Ms. Gaddis's observation that C.L.E. "appears to understand what is expected of her in social interactions, but that she does not ask for permission to do things, bosses other students, and does not show respect or obey rules." (Exhibit 2E/4)." (*Id*., PAGEID #: 72). This observation is consistent with the findings that C.L.E. has average intelligence but has problems in the domain. (*See, e.g.*, Doc. 10-7, PAGEID #: 388–89 (Dr. Nadkarni's findings of general cognitive ability in the average range but noting C.L.E.'s aggressive and defiant behavior); Doc. 10-6, PAGEID #: 250–51 (Mrs. Rupe's finding that C.L.E. is average and above average in academic performance, but observing C.L.E. often and very often had problems with social behavior). Indeed, Ms. Gaddis's evaluation reveals that C.L.E. has many serious and very serious problems interacting and relating with others and that those problems occur frequently. (*See* Doc. 10-6, PAGEID #: 213) (noting C.L.E.'s serious problem playing cooperatively with other children (daily), making and keeping friends (daily), and expressing anger appropriately (daily) and very serious problem asking permission appropriately (daily), following rules (classroom, games, sports) (daily), respecting/obeying adults in authority (hourly), and interpreting meaning of facial expression, body language, hints, and sarcasm (hourly)).

The ALJ also noted that C.L.E. does not receive special programming at school and was terminated from behavioral therapy.  (Doc. 10-2, PAGEID #: 72).  In doing so, the ALJ ignored Dr. Nadkarni's recommendation that the results of C.L.E.'s evaluation be shared with school personnel to see if any accommodations can be made for her, and that C.L.E. engage in ongoing outpatient therapy and a social skills training program.  (Doc. 10-7, PAGEID #: 389); (*see also* Doc. 10-8, PAGEID #: 770 (Dr. Kerns-Huffman's recommendation for mental health treatment, improvement with taking ownership of actions, a mental health treatment plan, and behavior modification training)).

Further, the ALJ disregarded C.L.E.'s Tourette syndrome diagnosis merely because her tics "were not observed or heard during behavioral therapy, and she presented as appropriate for her developmental age during the hearing."  (Doc. 10-2, PAGEID #: 72).  This determination is inapposite to his finding that C.L.E.'s Tourette syndrome constituted a severe impairment.  (*Id*., PAGEID #:  65).

Finally, the ALJ relied on Dr. Block's opinion that C.L.E.'s "difficulty in this area is less than marked, which is consistent with the totality of the evidence."  (Doc. 10-2, PAGEID #: 72). As noted, this finding is not consistent with the totality of the evidence, and Dr. Block improperly relied on Ms. Gaddis's opinion in finding a less than marked impairment because Ms. Gaddis's opinion revealed frequent serious and very serious problems interacting and relating with others.  *See supra* page 16.

In the domain of interacting and relating with others, the regulations indicate that a school-age child should, *inter alia*, "be able to develop more lasting friendships" with children of the same age; "begin to understand how to work in groups to create projects and solve problems;" and "have an increasing ability to understand another's point of view and to tolerate

17

differences." 20 C.F.R. § 416.926a(e)(2)(iii). Both Ms. Gaddis and Mrs. Rupe, who had the opportunity to observe C.L.E. in class on a daily basis, opined that C.L.E. has notable problems with these skills. *See supra* page 16. The ALJ improperly minimized those opinions on the ground that "neither is an acceptable medical source," and they "are in the form of check-marked boxes on standardized forms, and do not provide more than yes/no answers to the questions." (*Id.*, PAGEID #: 69). This is contrary to the relevant regulation, which requires the ALJ to consider both medical and non-medical evidence relevant to whether a child's limitation are marked or extreme. 20 C.F.R. § 416.926a(a). In addition, the ALJ assigned great weight to Dr. Block's opinion, which also was in the form of check-marked boxes on a standardized form. Finally, the ALJ selected portions of the psychologists' reports that appeared to support his finding, when the totality of the reports captured C.L.E.'s noted problems interacting and relating with others.

Despite Defendant's arguments to the contrary, the ALJ's finding that C.L.E. has a less than marked impairment in the domain of interacting and relating with others is not supported by substantial evidence in the current record. Consequently, the Court will reverse Defendant's non-disability finding and remand this case to the ALJ under Sentence Four of § 405(g). Further, the Court's decision to reverse and remand on the first assignment of error alleviates the need for analysis on Plaintiff's second assignment of error. Nevertheless, on remand, the ALJ may consider Plaintiff's remaining assignment of error if appropriate.

## IV. CONCLUSION

Based on the foregoing, it is **RECOMMENDED** that the Court **REVERSE** the Commissioner of Social Security's non-disability finding and **REMAND** this case to the Commissioner and the ALJ under Sentence Four of § 405(g).

## V. PROCEDURE ON OBJECTIONS

If any party objects to this Report and Recommendation, that party may, within fourteen (14) days of the date of this Report, file and serve on all parties written objections to those specific proposed findings or recommendations to which objection is made, together with supporting authority for the objection(s). A judge of this Court shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made. Upon proper objections, a judge of this Court may accept, reject, or modify, in whole or in part, the findings or recommendations made herein, may receive further evidence or may recommit this matter to the magistrate judge with instructions. 28 U.S.C. § 636(b)(1).

The parties are specifically advised that failure to object to the Report and Recommendation will result in a waiver of the right to have the district judge review the Report and Recommendation *de novo*, and also operates as a waiver of the right to appeal the decision of the District Court adopting the Report and Recommendation. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

IT IS SO ORDERED.

Date: January 11, 2017　　　　　　　　　　　　/s/ Kimberly A. Jolson
　　　　　　　　　　　　　　　　　　　　　　KIMBERLY A. JOLSON
　　　　　　　　　　　　　　　　　　　　　　UNITED STATES MAGISTRATE JUDGE